IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 13, 2020 Session

## IN RE ARIANNA B.

**Appeal from the Chancery Court for Knox County**
**No. 198512-1     John F. Weaver, Chancellor**

_____

## No. E2020-00487-COA-R3-PT

_____

This appeal concerns the termination of a mother's parental rights. Amy B. ("Mother") is the mother of the minor child Arianna B. ("the Child"). At Mother's request, Kayla A. ("Petitioner"), the Child's paternal aunt, assumed temporary custody of the Child. Petitioner later filed a petition in the Chancery Court for Knox County ("the Trial Court") seeking to terminate Mother's parental rights. After trial, the Trial Court entered an order finding that Petitioner had proven the ground of failure to support and that termination of Mother's parental rights is in the Child's best interest. Mother appeals, arguing among other things that Tenn. Code Ann. § 36-1-102(1), as amended in 2018, is unconstitutional for shifting the burden of proof on willfulness to parents. As Mother failed to raise this issue below and the statute is not obviously unconstitutional on its face, we decline to consider Mother's tardy constitutional challenge. We find the ground of failure to support was proven by clear and convincing evidence, and, by the same standard, that termination of Mother's parental rights is in the Child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which KENNY W. ARMSTRONG and KRISTI M. DAVIS, JJ., joined.

Ben H. Houston, II, Knoxville, Tennessee, for the appellant, Amy B.[1]

David A. Montgomery, Knoxville, Tennessee, for the appellee, Kayla A.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; and, Jordan K. Crews, Assistant Attorney General, for the appellee, the State of Tennessee.

---

[1] Attorney Houston was not trial counsel for Mother.

# OPINION

## Background

The Child, born in 2012, initially lived with her biological father and Mother in Mountain City, Tennessee. In 2013, the Child's father died. Afterward, Mother and the Child lived with Mother's family in West Virginia and Pennsylvania. The Child also spent some time in Delaware with Mother and Mother's boyfriend, Houston S. Mother has a child, Carter S., by Houston S. Mother encountered difficulties in raising the Child. In September 2018, Mother granted Petitioner, the Child's paternal aunt, physical custody of the Child, signing an Authorization Form and Limited Power of Attorney for Care of Minor Child. Presently, the Child lives with Petitioner and her son in Knox County, Tennessee.

In July 2019, after Mother informed Petitioner via text that she was revoking the latter's custody of the Child, Petitioner filed her Petition for Adoption by a Relative and for Termination of Parental Rights in the Trial Court. Petitioner alleged three purportedly distinct grounds: (1) failure to visit, (2) failure to support; and (3) failure to make reasonable payments toward support.[2] Petitioner also filed a motion for appointment of emergency guardian, which was granted. The termination petition was tried over the course of three days—December 16 and 18, 2019, and January 27, 2020. We proceed to summarize the pertinent trial testimony.

Charlene W., Mother's great aunt, testified that she saw Mother smoke marijuana several years earlier. As to where this took place in relation to the Child, Charlene W. stated: "Amy would -- I think the pot smoking would be done outside. And so it wouldn't have been a problem for her to have [the Child] with her outside while smoking marijuana. But that was pretty much done outside, what I seen." Charlene W. testified that, for a time, Mother left the Child at her brother Mark F.'s house, which was dirty and lacked running water. Charlene W. stated further that the Child was not well-dressed or well-groomed when she saw her. However, Charlene W. stated that the Child had enough clothes packed when she picked her up for a visit in March 2018, although what she was wearing was dirty.

Stanley W., Charlene W.'s husband, testified as well. He stated that in 2017 he witnessed Mother smoke methamphetamine while she was in West Virginia. Stanley W. testified also that he saw Mother smoke marijuana in the Child's presence. Stanley W. acknowledged his own history of drug abuse, as well as convictions for robbery, burglary and illegal drugs. Stanley W. testified that he has since been sober.

---

[2] We say purportedly distinct because, from our review of Tennessee law, failure to support and failure to make reasonable payments toward support comprise the same single species of abandonment often referred to simply as failure to support.

Houston S., Mother's former boyfriend and father of their son Carter S., testified that he and Mother lived together in Delaware for a time beginning in 2015. Houston S. testified that he witnessed Mother take illegal drugs. He stated further that Mother would lie in bed for days at a time. Houston S. asserted that Mother would feed the children things like cupcakes and Reece's cups for meals. The Child had to have her teeth removed when she was three years old. Houston S. had sought, and obtained, temporary full custody of Carter S. On cross-examination, Houston S. was pressed on his account of Mother's parenting, as well as his motivations for testifying, as follows:

> Q. Now, you were talking about, as I recall, [Mother] being around Carter and [the Child] and not doing certain things, not feeding them breakfast properly or not making sure they brushed their teeth or things like that. You remember that testimony?
> A. Correct.

***

> Q. Okay. So you didn't feel it was necessary to intervene to make them brush their teeth or to see that they ate something other than Reese's cups or cupcakes or whatever, right?
> A. I intervened whenever I could.
> Q. Well, on this occasion, you just said that you didn't do anything. That's what they had, that they didn't brush their teeth.
> A. Yeah. There was nothing I could do when Amy's sitting there shoving it down their throats.
> Q. Okay. You were absolutely helpless. Was this about the time you were coming out of detox?
> A. That was well after.
> Q. The time that you came out of detox. And were you then --
> A. Yeah. That's when Amy and I first got together was when I first came out of detox.
> Q. Okay. And what were you detoxing off of?
> A. Opiates.
> Q. Okay. But later you got into meth. I think you said that you and Amy went to purchase meth in Ripley or Mountain City?
> A. Yes. Amy -- Amy had got me onto meth. Yes.
> Q. And you were a willing participant in that?
> A. Yes, I was.

***

Q. Mr. [S.], it's fair to say that you do not have a good opinion of [Mother], right?

A. What you see is what you get with [Mother].

Q. You don't have a good opinion of [Mother], correct?

A. Correct.

Q. Okay. And it would give you pleasure to have her parental rights terminated to her daughter [the Child]?

A. Not at all.

Q. Not at all?

A. It has nothing to do with her. It's [the Child] that it has everything to do with. If Amy was a fit mother, I would love for her to be in my son and [the Child's] life. If she got her stuff together. But that's not the case. So I want the kids in the best, safest place they can be.

Q. And it's been how long since you saw --

A. That's the only reason I'm testifying today. It has nothing to do with my relationship with [Mother]. I'm just stating what I've seen over the years. And yeah, I used to be a bad person, but I got clean and I changed my life. Amy has not. That's the difference.

Q. And when was the last time you saw Amy?

A. Halloween.

Q. Of what year?

A. This year, 2019.

Continuing his testimony, Houston S. was asked about Mother's ability to parent the Child, as well as Mother's struggles with drug abuse:

Q. Did you have concerns about [the Child's] well-being while she was in custody of [Mother]?

A. Yes.

Q. Why were you concerned?

A. Because Amy was -- is a drug addict. Like I said, there's no structure. She doesn't go to school. There's no routine. She'll load the kids up at the drop of a dime and drive eight hours without a care in the world for the kids schedule or if the kids had school, it doesn't matter.

Q. So that concerns you about her having custody of Carter?

A. Excuse me?

Q. And that concerns you of her having --

A. Of [the Child].

Q. Yes, of [the Child]. That --

A. Amy doesn't have a stable place to live. Yes. She's not a stable parent or person at all. She can barely take care of herself, let alone a child.

-4-

Q. Do you think that it's in the best interest for [the Child] to be with [Petitioner]?
A. Yes, I do.

Lois D., Houston S.'s mother, testified that Mother and the Child stayed with her for periods of time in 2017. Lois D. stated that, during her first stay, Mother spent much of the time sleeping. Lois D. testified that once, when Mother brought Carter S. by the house for a visit with his father, Carter S. appeared dirty and had no diaper on.

Petitioner testified on both of the last two days of trial. Before Petitioner assumed custody of the Child on September 1, 2018, Petitioner had only seen the Child on special occasions like Christmas. Petitioner stated that she assumed custody of the Child at Mother's request because Mother was unable to care for the Child. Petitioner testified that Mother never sent her any child support at all:

Q. For the period of four months prior to your filing your petition, which the period would be March 31st to July 30th of 2019, has [Mother] ever provided any financial or material support for [the Child] to you?
A. No.

***

Q. But she ever actually gave her any gifts?
A. No. She was going to get her something for her birthday, but it was the retailer's fault. She was going to get her a dress for her first picture day at school, but it was the retailer's fault. And no, she just didn't get her anything for Christmas, so no.
Q. Now, let's talk about a larger period of time from the date that [the Child] came to live with you on September 1st, 2018, until the present time. Has [Mother] provided any financial or material support for [the Child]?
A. No.

Petitioner works at the University of Tennessee as a financial specialist. She lives in Knox County with her nine-year-old son and the Child. Petitioner testified that she takes the Child to her doctor and dentist appointments, takes her to school, and keeps her fed and clothed.

On the final day of trial, January 27, 2020, Mother did not appear. No explanation for her absence was forthcoming. The following exchange occurred between the Chancellor and Mother's attorney:

THE COURT: … Is your client here, Mr. Gulley?

MR. GULLEY: I have not seen her, nor have I had any communication from her since last week, Your Honor.

THE COURT: Okay. Well, we'll just proceed, then, folks. All right. Let's see. We were to resume, I believe, with your cross-examination of the Petitioner.

Thus, Mother wound up never testifying in the matter. Petitioner, resuming her testimony, was asked why on one occasion she denied Mother a requested visit with the Child. Petitioner testified:

Q. … Is this a printout of all texts between you and [Mother] from and including March 30, 2019, through July 31, 2019?
A. Yes.
Q. Is this something you printed out from your phone?
A. Yes.
Q. Have you read through this printout of texts carefully and completely?
A. Yes.
Q. And in these texts, in all these texts, and all other means of communication between you and [Mother], from and including March 30, 2019, through July 31, 2019, how many times did she not state a general desire to be with her daughter but specifically ask you to visit her daughter, such as giving you a time and a place to meet?
A. Once.
Q. Can you tell us what the date of that one time was?
A. July 30, 2018.
Q. And did you agree to allow Amy to see her daughter on that date?
A. No.
Q. Can you tell us your reasons why not?

***

A. I knew that she had a drug addiction and she had a court date coming up. And I didn't know if she would get thrown in jail, you know. I didn't know what the outcome would be for that charge. And I also knew that I was filing a petition for adoption the next day and I wanted the Court to make the very best decision for [the Child].

Mother's affidavit of indigency, which was filed in the Trial Court in August 2017, reflected that she then received "$900 a month daughter [sic] father passed away" in government assistance. Petitioner testified that, in August or September of 2019, she had

the payee on the government assistance changed from Mother to her so that the Child would receive the government assistance moving forward. Exhibit 17, a letter from the Social Security Administration to Petitioner, reflects that the Child's benefits from September 2018 to August 2019 totaled $8,980. Petitioner stated that Mother never sent her any of that money to help support the Child. Regarding improvements the Child made since entering her custody, Petitioner testified:

Q. Has [the Child] made improvements since she started living with you?
A. Yes.
Q. Can you describe those improvements for the Court?
A. You know, when she first time started -- well, she had to repeat kindergarten. So when she got with me, I enrolled her in kindergarten and she did struggle a bit as far as reading, math, you know, things like that. She had a hard time, you know, doing the homework. Like, when we got home, you know, telling her, you know, this is what have to do to pass, this is what you need to do, you know, she struggled with that as far as a structured environment, you know. But as far as evidence from her report card and things like that if ever she was needing to meet those expectations, she has met those expectations and beyond. You know, she's doing really great.
Q. And based on what you've seen, these improvements, the mother's reputation, and what you have seen out of the mother's behavior, do you think that it's in the best interest for the Court to terminate parental rights and allow you to adopt [the Child]?
A. Yes.

At the conclusion of trial, the Trial Court found that Petitioner had proven the ground of failure to support. As for the ground of failure to visit, the Trial Court found it "not necessary" to reach and thus never ruled on it. The Trial Court also found that termination of Mother's parental rights is in the Child's best interest. In February 2020, the Trial Court entered its final judgment, wherein it incorporated its transcribed oral ruling. The Trial Court found, in relevant part:

The respondent has abandoned the child by failing to provide any support to the child for four consecutive months immediately preceding the filing of this petition under TCA Section 36-1-113(g) (1) and 36-1-102(1)(a)(i), and that the respondent has abandoned the child by failing to make reasonable payments towards the support of the child for four consecutive months immediately preceding the filing of this petition under TCA section 36-1-113(g)(1) and 36-1-102(1) (a)(i).

The mother in this case was receiving the child's Social Security benefits and not even passing those along to the child until the petitioner had

the payee of the checks changed. The mother did net pass any of the money received by her for the benefit of the child, passed none of that on to the petitioner, during the period of four months immediately preceding the filing of the petition.

And actually, beyond that time, she never passed any of it along to the mother, even after -- she never passed any of it to the petitioner at any time after the petitioner received custody of the child from the mother on September 1, 2018, until the petitioner had the payee changed, sometime around September 2019.

As will be discussed, the evidence is also clear and convincing that the termination of the respondent's parental rights is in the best interest of the child.

The Court, regressing for a moment, did not reach the ground of whether or not the respondent has abandoned the child by failing to visit the child for four consecutive months immediately preceding the filing of the petition because it's not necessary for the Court to reach that issue.

All right. The respondent is addicted to illegal drugs and uses an array illegal drugs, from marijuana to methamphetamines, and including meth, crack, opiates, Adderall, and, as referred to in the testimony, benzos. The mother had gone from residence to residence much of the time from March 23, 2018 to September 1, 2018. When the petitioner got physical custody, the respondent and the child were homeless. At age three, the child had to have her baby teeth removed. The child's progress in school was delayed because the child was to be detained from graduating from kindergarten because the mother had failed to take the child to school for an excessive -- for excessive periods of time. The respondent's mother gave the child no structure and no diet except a random diet, often just consisting of cupcakes. The mother would stay in bed for three to four days, leaving the child to take care of herself. The child also had to take care of her own meals, showers, and dressing herself. The child had the poorest of hygiene and minimal manners.

…

And the child was also left with caring for her younger brother.

Referring to the factors of Tennessee Code Annotated 36-1-113(i), the evidence is clear and convincing that the first factor, 1, under that subsection, makes it clear that the child's best interest is in favor of termination of the respondent's parental rights.

The second factor is not applicable to this case.

The third factor, likewise, indicates that it is in the child's best interest to terminate the biological mother's parental rights.

The fourth factor, that factor has been proven in this regard, that there was no meaningful relationship between the mother, respondent, and the child during the period after the mother's turning over custody to the paternal aunt on September 1, 2018.

As to the fifth factor, likewise, it is clear and convincing upon that factor that the mother's parental rights should be terminated because the child is now thriving, as will be hereinafter discussed, and she's not had that opportunity to thrive before. And the continuity need not and should not be disturbed.

The sixth factor, also, is clear and convincing -- the proof is clear and convincing with consideration of the sixth factor that the mother has shown neglect toward the child.

The seventh factor is also -- considering that factor, it's clear and convincing that the physical environment of the child's present home is healthy and safe.

But under -- with respect to the child's prior living with her respondent, with her mother, there was the use of controlled substances, illegal controlled substances, on and around the child on the premises where the child was present. Although not in the child's immediate presence, illegal drugs were used around the child. And the respondent Mother's regular use of illegal drugs rendered her unable to care for the child in a safe and stable manner.

The evidence is also clear and convincing that factor eight shows that the respondent, Mother's, mental and/or emotional status is detrimental to the child from the use of drugs, which renders her unable to care for the child and to provide a safe and stable home and safe and stable supervision for the child.

The ninth factor, considering the ninth factor, it is also clear and convincing from the evidence that the mother has paid no child support consistent with the child support guidelines.

In fact, the mother never even forwarded the child's Social Security benefits to the child or to the person with whom the mother had given physical custody of the child.

All right. Since the petitioner obtained physical custody of the child from the mother, who was unable to care for the child, the child is now healthy, clean, thriving in school making straight A's, and is thriving overall. The child is happy in the home where she now is with her paternal aunt and with the paternal aunt's son, the child's nine-year-old cousin.

The Court finds and concludes by clear and convincing evidence that the termination of the respondent's parental rights is in the best interest of the child.

(Format modified).  Mother timely appealed to this Court.

## Discussion

We restate and consolidate the issues Mother raises on appeal as follows:  1) whether Mother was deprived of fundamentally fair procedures by her trial counsel's failure to seek a continuance or request a recess to contact her when she did not appear on the final day of trial; 2) whether Tenn. Code Ann. § 36-1-102(1), as amended in 2018, violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Section 8 of the Tennessee Constitution by shifting the burden of proof from the petitioner to the parent on the issue of whether the parent's failure to support the child was willful; 3) whether Mother was deprived of fundamentally fair procedures based on her trial counsel's failure to challenge the constitutionality of Tenn. Code Ann. § 36-1-102(1); 4) whether the Trial Court erred in finding that the ground of failure to support was proven by clear and convincing evidence, and in declining to find that Mother had proven the affirmative defense of lack of willfulness; and, 5) whether the Trial Court erred in finding that termination of Mother's parental rights is in the Child's best interest.  Both Petitioner and the State of Tennessee, which filed a brief on the constitutionality of Tenn. Code Ann. § 36-1-102(1), raise the separate issue of whether Mother waived her constitutional challenge to Tenn. Code Ann. § 36-1-102(1), as amended in 2018, for failure to raise it in the proceedings below.  If the issue is not deemed waived, both Petitioner and the State argue that Tenn. Code Ann. § 36-1-102(1) is constitutional.  Finally, Petitioner attempts to raise the issue of whether she also proved the ground of failure to visit by clear and convincing evidence.  In her reply brief, Mother argues that Petitioner waived this issue by failing to identify it as such in her statement of issues.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3]  *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").  Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

-11-

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

-13-

In certain of Mother's issues, she argues that her trial counsel's performance was so deficient as to deprive her of fundamentally fair procedures. Our Supreme Court has addressed this subject as follows: "[W]e decline to hold that securing the constitutional right of parents to fundamentally fair procedures requires adoption of an additional procedure, subsequent to or separate from an appeal as of right, by which parents may attack the judgment terminating parental rights based upon ineffective assistance of appointed counsel." *In re Carrington H.*, 483 S.W.3d at 535. Nevertheless, our Supreme Court analyzed on direct appeal a parent's claim of ineffective assistance of counsel by determining whether the actions of counsel prevented the parent from receiving a fundamentally fair proceeding. See *id*. at 535-36. Therefore, where raised as an issue in this direct appeal, we will address whether the representation of Mother by her trial counsel deprived Mother of fundamentally fair procedures.

The credibility of the witnesses at trial also is at issue on appeal. Regarding our deference to a trial court's credibility determinations, our Supreme Court has stated:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⸺ U.S. ⸺, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

Having reviewed the applicable standards, we address Mother's first issue of whether she was deprived of fundamentally fair procedures by her trial counsel's failure to seek a continuance or request a recess to contact her when she did not appear on the final day of trial. Mother was present on the first and second days of trial, but not the third. Mother offers no explanation or excuse for her absence that day. She argues simply that,

-14-

given the profound implications of a parental rights termination hearing, her trial counsel was deficient in not seeking a continuance or recess to try to give Mother another chance to participate.

We disagree. Mother ultimately must accept responsibility for her failure to appear. This is especially so in the absence of any explanation for why she did not show up; there is no hint that she was, for example, prevented from attending, or lacked notice. It is just as possible Mother simply chose not to appear, for tactical reasons or otherwise. We find that Mother was not denied fundamentally fair procedures just because her trial counsel did not request a continuance or recess when Mother failed to appear for the last day of trial.

We next address whether Tenn. Code Ann. § 36-1-102(1), as amended in 2018, violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Section 8 of the Tennessee Constitution by shifting the burden of proof from the petitioner to the parent on the issue of whether the parent's failure to support the child was willful. At the time the petition in this case was filed, July 31, 2019, the statutory ground of abandonment for failure to support read as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2020).[6]

The pertinent definition of abandonment read:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or

---

[6] The parental rights termination statutes have been amended since the petition herein was filed, but these amendments do not bear on the issues on appeal.

guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

\*\*\*

B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

\*\*\*

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

\*\*\*

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children;

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure;

Tenn. Code Ann. § 36-1-102(1) (Supp. 2020).

Effective July 1, 2018, our General Assembly amended Tenn. Code Ann. § 36-1-102(1) to make the absence of willfulness an affirmative defense available to parents for cases filed as of the amendment's effective date. *See* 2018 Tenn. Pub. Acts, Ch. 875, § 2 (H.B. 1856). This amended version of the statute applies to the present matter, which was

commenced on July 31, 2019. However, Mother argues that the statute as amended is unconstitutional. For their parts, both Petitioner and the State of Tennessee contend that Mother waived this issue by failing to raise it in the proceedings below.

With regard to constitutional challenges raised for the first time on appeal, our Supreme Court has stated:

> It has long been the general rule that questions not raised in the trial court will not be entertained on appeal and this rule applies to an attempt to make a constitutional attack upon the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion.

*Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983). Mother contends that Tenn. Code Ann. § 36-1-102(1) is, in fact, obviously unconstitutional on its face. In her brief, Mother argues, in part: "[T]his impermissible burden shifting is still in direct contravention of a mandate that has been repeatedly emphasized by both the Tennessee Supreme Court and the United States Supreme Court in termination of parental rights cases that all elements of a termination of parental rights case must be proven by clear and convincing evidence." The most on-point case relied upon by Mother is *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999), wherein our Supreme Court declared the definition of failure to support found then at Tenn. Code Ann. § 36-1-102(1)(D) unconstitutional because it allowed for parental rights to be terminated for failure to support even if the failure was unintentional. Our Supreme Court reviewed the statute and held it was unconstitutional, stating in part:

> *(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" mean that, for a period of four (4) consecutive months, no monetary support was paid or that the amount of support paid is token support;*[7]
>
> ***
>
> Since the statutory definitions of "willfully failed to support" and "willfully failed to make reasonable payment toward such child's support" in effect create an irrebuttable presumption that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional, we hold that those definitions are unconstitutional. The statutory definitions simply do not allow for the type of individualized

---

[7] This provision specifically deleted any requirement for willfulness in the definition of "willfully failed to support" and "willfully failed to make reasonable payment toward such child's support."

decision-making which must take place when a fundamental constitutional right is at stake. Therefore, they impermissibly infringe upon a parent's right to the care and custody of his or her children.

The federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away. *Stanley*, 405 U.S. at 658-59, 92 S.Ct. 1208; *Bond*, 896 S.W.2d at 548. As the Supreme Court noted in *Stanley*, a procedure which elevates a presumption over a requirement of proof of unfitness may be cheaper and easier to administer than an individualized determination, but it "needlessly risks running roughshod over the important interests of both parent and child." 405 U.S. at 658, 92 S. Ct. 1208.

We further hold that only that portion of the statute contained at Tennessee Code Annotated section 36-1-102(1)(D), which includes the unconstitutional definitions, is hereby invalidated….

*In re Swanson*, 2 S.W.3d at 185, 188 (footnote in original but renumbered).

Mother argues that the 2018 amendment to Tenn. Code Ann. § 36-1-102(1) flouts *In re Swanson* by impermissibly shifting to parents the burden of proving that their failure to support was not willful. Mother states that a petitioning party in a parental rights termination case must prove all of the elements of its case by clear and convincing evidence. To this end, Mother invokes the Supreme Court of the United States in *Troxel v. Granville*, 530 U.S. 57, 69, 120 S.Ct. 2054, 147 L.E.2d 49 (2000) and its holding that a framework used by a trial court placing the burden on a custodial parent to disprove that grandparent visitation would be in the best interests of the children violated the custodial parent's constitutional rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

We do not find *Troxel*, a grandparent visitation case, particularly salient in the present case. *In re Swanson*, on the other hand, bears more relevance. In *In re Swanson*, our Supreme Court held that the then-existing definition of abandonment by failure to support in Tennessee was unconstitutional because it made no provision for whether the parent's failure to support was intentional. If the 2018 amendment to Tenn. Code Ann. § 36-1-102(1) merely restored outright the pre-*In re Swanson* definition of failure to support, we would be constrained to find that it is obviously unconstitutional on its face in light of its direct contradiction to our Supreme Court's 1999 holding. In that scenario, the amended statute would be in blatant defiance of the controlling law. However, that is not the scenario we face here. While Tenn. Code Ann. § 36-1-102(1), as amended in 2018, eliminates the

willful component of the petitioning party's burden, it does not create an irrebuttable presumption that a parent's failure to support constitutes abandonment. Instead, Tenn. Code Ann. § 36-1-102(1), as amended, leaves open an avenue by way of affirmative defense for a parent to establish that her failure to support was not willful. In this way, Tenn. Code Ann. § 36-1-102(1), as amended, contends with our Supreme Court's holding in *In re Swanson*. It is not a carbon copy of the statutory definition that was struck down in 1999.

As Mother failed to raise this constitutional challenge in the proceedings below, our threshold for considering her issue for the first time on appeal is whether the challenged statute is obviously unconstitutional on its face. Tenn. Code Ann. § 36-1-102(1), as amended in 2018, contends with and is responsive to *In re Swanson* in that it makes available to parents facing an allegation of failure to support an affirmative defense that their failure to support was not willful. Given this, we conclude that Tenn. Code Ann. § 36-1-102(1) is not obviously unconstitutional on its face. We, therefore, decline to consider Mother's constitutional challenge to Tenn. Code Ann. § 36-1-102(1).[8]

We next address whether Mother was deprived of fundamentally fair procedures based on her trial counsel's failure to challenge the constitutionality of Tenn. Code Ann. § 36-1-102(1). Mother argues that trial counsel have a duty to raise all constitutional challenges when the situation warrants. Mother argues further that it was especially deficient for Mother's trial counsel to not challenge the statute's constitutionality given that it turned out to be the only ground found against her. In the previous issue, we concluded that, at the very least, Tenn. Code Ann. § 36-1-102(1) is not obviously unconstitutional on its face such that further discussion is obviated. Further, we are aware of no Tennessee Supreme Court or Tennessee Court of Appeals opinion addressing whether Tenn. Code Ann. § 36-1-102(1), as amended in 2018, is unconstitutional. The issue is not the open and shut case Mother portrays it as. In view of the foregoing, Mother's trial counsel's election not to challenge the constitutionality of Tenn. Code Ann. § 36-1-102(1) was not so deficient as to deprive Mother of fundamentally fair procedures.

We next address whether the Trial Court erred in finding that the ground of failure to support was proven by clear and convincing evidence, and in declining to find that Mother had proven the affirmative defense of lack of willfulness. The relevant four-month window for our analysis is March 31, 2019 through July 30, 2019, the latter being the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed*. Mother never rendered any support for the Child. However, Mother makes two separate

---

[8] We expressly decline to hold that Tenn. Code Ann. § 36-1-102(1) is constitutional, either. Our inquiry was only whether the statute is obviously unconstitutional on its face. It is not, so we go no further with the issue in this appeal.

arguments—that the support she *tried* to render cannot be deemed token in nature because the record is insufficient as to her means at the relevant time, and that otherwise, her failure to support was not willful. With respect to the latter, Petitioner argues that Mother waived the issue of her lack of willfulness because she did not assert it in an answer to the petition. In her reply brief, Mother argues the issue was tried by consent. As we will discuss, even if Mother did not waive the affirmative defense of a lack of willfulness, her arguments on that front are unavailing.

Mother points to three items she purchased for the Child but never delivered: a belt, as seen in a text she sent to Petitioner on April 4, 2019 with the statement "Show ari this belt I bought her lol she always wanted a belt lol"; an unspecified June 2019 birthday gift; and a dress for the Child's first picture day of school. Mother states she never delivered the belt because her ability to visit was thwarted by Petitioner. Regarding the other two would-be gifts, Mother points to Petitioner's testimony that they were held up because of "the retailers." In addition, Mother submits that her very act of trying to resume full custody of the Child by coming in from out of state could be construed as expenditures toward the Child. Mother argues there is a dearth of evidence in the record as to her means, such that it is impossible to work out what would constitute "token support" under these circumstances. Regarding what constitutes token support, this Court has discussed:

> It is axiomatic that "in order to establish the ground of abandonment by willful failure to support by clear and convincing evidence, the party seeking termination must generally 'submit ... evidence regarding [the parent's] employment, income, [or] other non-monetary assets,' as well as the parent's 'expenses during the four-month period.'" *In re Michael B.*, No. M2015-02497-COA-R3-PT, 2016 WL 7486361, at *11 (Tenn. Ct. App. Oct. 6, 2016) (quoting *In re Destiny H.*, No. W2015-00649-COA-R3-PT, 2016 WL 722143, at *9 (Tenn. Ct. App. Feb. 24, 2016)). Such evidence need not be an accounting of every dollar earned and spent, and it need not even be tied to dollars and cents, but it must be clear and convincing evidence that the parent had the capacity to pay support, did not do so, and had no justification for not doing so. In the case of *In re Adoption of Angela E.*, 402 S.W.3d at 641, in the context of examining whether the father's payments were "token support," our Supreme Court stated that the evidence of the father's income and expenses was "limited at best" and failed to prove that his payments were "token support." *See also In re Michael B.*, 2016 WL 7486361, at *11 (discussing *In re Adoption of Angela E.* and other cases regarding proof of employment, income, other non-monetary assets, and expenses necessary to establish a parent's capacity to pay support).

*In re Preston L.*, No. M2016-02338-COA-R3-PT, 2017 WL 4315356, at \*5 (Tenn. Ct. App. Sept. 27, 2017), *no appl. perm. appeal filed.*

We disagree with Mother that the record is insufficient as to her means in the relevant time frame. We note that under Tenn. Code Ann. § 36-1-102(1), as amended in 2018, the burden was on Mother to prove her failure to support was not willful. Apart from that, the uncontroverted evidence reflects that Mother was payee on certain Social Security benefits, for which the Child was beneficiary owing to her father's death, of around $900 per month. Mother remained payee until August or September of 2019 when Petitioner had herself designated the new payee so the Child could obtain the benefits. Exhibit 17, a letter from the Social Security Administration to Petitioner, reflects that the Child's benefits from September 2018—when the Child entered Petitioner's custody—to August 2019 were $8,980. The evidence is uncontroverted that, in the interim between the Child entering Petitioner's custody to Petitioner being designated the new payee on the benefits, Mother never passed any of these benefits along to Petitioner for the Child's benefit. Mother offers no explanation for why she never sent any of this money to Petitioner for the Child's benefit when it was intended for the Child's benefit to begin with. Mother does reference being thwarted in her bid to visit and resume custody. However, a parent's duty to support is distinct from her duty to visit. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). In any event, a texted photograph of a belt and a couple of gifts that never were delivered is not child support under any reasonable definition of the term. Mother's "child support" was purely notional; it did not rise even to token. Lastly, Mother's 11th hour bid to resume custody was neither a substitute for support nor does it excuse her non-support.

The evidence does not preponderate against any of the Trial Court's findings relative to this issue of Mother's failure to support. Mother failed to prove by a preponderance of the evidence that her failure to support was not willful. We find, as did the Trial Court, that the ground of failure to support was proven against Mother by clear and convincing evidence.

Before addressing the Child's best interest, we note that Petitioner attempts to raise an issue of whether she also proved the additional ground of failure to visit. As Mother correctly points out, Petitioner does not explicitly identify this as a separate issue in her statement of issues, instead ambiguously lumping it in with her overall discussion on Tenn. Code Ann. § 36-1-102(1). "Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals." *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). Furthermore, in her brief's conclusion, Petitioner simply requests that we affirm the Trial Court. Petitioner writes: "The Final Judgment of Termination of Parental Rights entered by the trial court is well-

-21-

grounded in law and supported by clear and convincing evidence. Therefore, the Petitioner, Kayla A., respectfully requests this Court to affirm the termination of [Mother's] parental rights to [the Child]." A pure affirmance by us of the Trial Court would leave its ruling, or lack thereof, on the ground of failure to visit intact. Based on the foregoing, we find that Petitioner failed to successfully raise an issue on appeal regarding the ground of failure to visit.

The final issue we address is whether the Trial Court erred in finding that termination of Mother's parental rights is in the Child's best interest. When considering a child's best interest in parental rights termination cases, courts consider the following factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance

analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

Mother makes a litany of arguments as to why, per her reasoning, termination of her parental rights is not in the Child's best interest. For one, Mother takes issue with the credibility of the witnesses. For instance, Mother observes that Stanley W. is a convicted felon, and argues his testimony should be discounted. Mother also questions the motives of Houston S., given his conflict with Mother over custody of Carter S. Mother dismisses as incredible Houston S.'s claim that he could not prevent Mother from feeding the Child inappropriate meals. Mother argues further that the evidence at trial was stale, as the witnesses by and large had not seen Mother in quite some time. Mother states also that Petitioner thwarted her attempt to see the Child. In spite of that, Mother states she and the Child have a close bond, as reflected in text messages contained in the record where Petitioner says the Child has said she loves Mother. Continuing her arguments, Mother states that the record is insufficient to allow for a determination of how much she should have paid in child support under the guidelines. Finally, Mother states that the Trial Court wrongly failed to consider the possible negative consequences that severing the sibling relationship between the Child and her half-brother would have.

Insofar as Mother questions the credibility of the witnesses, we extend great deference to trial courts' credibility determinations. Unlike trial courts, we do not see or hear witnesses testify. It is evident from the Trial Court's judgment that it credited the witnesses' testimony. We leave these implicit credibility determinations undisturbed absent clear and convincing evidence to the contrary. We find no such evidence here. On the issue of child support, we note that Mother paid none—not just inadequate child support under the child support guidelines, but none whatsoever despite her receiving Social Security money meant for the Child's benefit as was found by the Trial Court. With respect to Mother's argument that the Trial Court failed to consider the consequences of severing the Child's relationship with her half-brother, she cites merely to the general principle that siblings should be placed together where possible. While that is true, we find no evidence in the record that this concern should override the other factors found against Mother.

-23-

Perhaps the most relevant factors in this case are factors (7) and (8), and more specifically, as they relate to Mother's addiction to drugs. Mother argues that the testimony at trial about her drug abuse was not contemporaneous to trial or even the filing of the petition and should therefore be discounted. However, Mother points to no evidence in the record establishing that she has since rectified her serious drug problem, a drug problem that severely hampered her ability to parent. Barring rectification of Mother's drug abuse and generally chaotic lifestyle, we are without serious doubt that the Child's best interest would not be served by restoring custody of the Child to Mother. The record shows no turnaround in Mother's conditions such that would make it safe for the Child to be returned to her care and custody any time soon. By contrast, the Child is thriving in Petitioner's home. The evidence does not preponderate against any of the Trial Court's findings made relative to the Child's best interest. We find by the standard of clear and convincing evidence, as did the Trial Court, that termination of Mother's parental rights is in the Child's best interest. We, therefore, affirm the Trial Court's order terminating Mother's parental rights to the Child.

## Conclusion

The Trial Court's judgment terminating Mother's parental rights to the Child is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Amy B., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE